Filed 5/5/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM THOMPSON et al., | |
| Plaintiffs and Appellants, | G060988 |
| v. | (Super. Ct. No. 30-2021-01184633) |
| TODD SPITZER et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendants and Respondents. | |

This court hereby orders that the opinion filed here on April 11, 2023, be modified as follows:

1.      On page 16, last paragraph, delete last sentence and *Isbell* citation, and add the following citation after the *Petrillo* citation:  "*Bearman v. Superior Court* (2004) 117 Cal.App.4th 463, 473 [waiver of the right to privacy is "narrowly construed and not lightly found"]"

2.      On page 18, delete last paragraph, beginning with "When evaluating . . ." and replace with the following paragraph:  "Based on the above allegations, we cannot find at this stage in the proceedings that alleged misdemeanants are providing knowing and voluntary waivers.  In particular, plaintiffs' allegations that alleged misdemeanants are unaware of the purposes for which Bode may use their DNA and that Bode may indefinitely keep their DNA raise additional concerns about the voluntariness of their waivers.  A DNA sample contains a trove of personal information.  As Justice Cuéllar explained in his dissent in *Buza*, "DNA samples contain a wealth of genetic information, which would make an individual nervous about possible violations of his or

her privacy as long as the information remains in the state's possession." (*Buza*, *supra*, 4 Cal.5th at p. 719 (dis. opn. of Cuéllar, J.).) "That one's DNA reveals much of a person's most private, closely guarded information is difficult to dispute." (*Id*. at p. 720.) A DNA sample can reveal "an arrestee's entire genetic code—information that has the capacity to reveal the individual's race, biological sex, ethnic background, familial relationships, behavioral characteristics, health status, genetic diseases, predisposition to certain traits, and even the propensity to engage in violent or criminal behavior." (*Ibid*.) A "DNA profile . . . thus has the potential to reveal vast amounts of personal information about those individuals, and to be used in ways starkly different relative to what justified the scheme. [Citation.] One can scarcely imagine personal information that falls more closely to the core of the 'realm of guaranteed privacy'. . . ." (*Ibid*.)"

3. On page 19, delete first complete paragraph, and replace with the following paragraphs: "Due to its complexity, a significant number of alleged misdemeanants will likely be unaware of the information their DNA may reveal and how that information may be exploited. And, as technology advances, DNA samples and profiles will reveal far more extensive information than we currently know. (*U.S. v. Kriesel* (9th Cir. 2007) 508 F.3d 941, 947-948; *U.S. v. Kincade* (9th Cir. 2004) 379 F.3d 813, 842, fn. 3 (conc. opn. of Gould, J.).) Because of this gap in knowledge, a vaguely worded DNA waiver can potentially conceal from alleged misdemeanants the persons having access to their DNA and/or the different purposes for which their DNA might be used. Here, based on the allegations and the contents of the waiver, alleged misdemeanants are not sufficiently apprised of the ways their DNA may be exploited for information now and in the future. Alleged misdemeanants are not informed that their DNA samples will be sent to a third party. Nor are they told how the third party will store their DNA information, how long it will retain their DNA information, or whether the third party can disseminate their DNA to other third parties.

"County Defendants argue our Supreme Court has "rejected these heightened privacy concerns specific to the collection of DNA," that we quoted above from Justice Cuéllar's dissent. (Citing *Buza*, *supra*, 4 Cal.5th at pp. 689-690.) We disagree. In *Buza*, the Supreme Court recognized that DNA collection involves heightened privacy interests. It stated, "[w]e . . . are mindful of the heightened privacy interests in the sensitive information that can be extracted from a person's DNA" which "implicate . . . the privacy rights enjoyed by all Californians under the explicit protection of article I, section 1 of the California Constitution." (*Ibid.*) However, the Supreme Court found the intrusion to these privacy interests was not unreasonable given the DNA Act's safeguards. (*Ibid.*) This case involves different issues than *Buza*. *Buza* analyzed whether mandatory DNA collection of arrested felons under the DNA Act was an unreasonable search and seizure. (*Id.* at pp. 664-665, 691.) In contrast, this case involves voluntary DNA collection from alleged misdemeanants. Our analysis does not focus on the reasonableness of the OCDA's conduct but on whether alleged misdemeanants are given sufficient information to knowingly and voluntarily waive their DNA rights. Within this context, alleged misdemeanants' knowledge of the third parties having access to their DNA and the purposes for which such persons could use their DNA is a relevant concern."

4. On page 19, delete last paragraph, beginning with "For a DNA waiver . . ." and replace with the following paragraph: "As set forth above, based on the allegations in the FAC, we find alleged misdemeanants were not given sufficient information as to how their DNA would be maintained and used. At this point in the proceeding, we need not set forth the exact requirements for the waiver. On remand, the trial court must weigh the facts and competing interests to determine whether the waivers are valid and, if not, how they are lacking."

3

5.      On page 20, delete first full paragraph, beginning with "Alleged misdemeanants must . . . " and also delete last paragraph, beginning with "Based on the allegations . . . ."

6.      On page 21, delete last paragraph, beginning with "As to the first element . . ." and replace with the following paragraph: "As to the first element, alleged misdemeanants have a privacy interest in their DNA and genetic information. (*Buza*, *supra*, 4 Cal.5th at pp. 689-690; *Mason*, *supra*, 209 Cal.App.4th at p. 381.) The second and third elements are also met. Based on the allegations in the FAC, alleged misdemeanants have a reasonable expectation that their DNA sample will not be provided to third parties to be indefinitely held for unknown purposes. As to the third element, the allegations that alleged misdemeanants' DNA can be held indefinitely by a third party for unknown uses without their informed consent is sufficient to state an invasion of privacy claim. (See *ibid*.)"

This modification does not change the judgment. The petition for rehearing is DENIED.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.

4

Filed 4/11/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| WILLIAM THOMPSON et al., | |
| Plaintiffs and Appellants, | G060988 |
| v. | (Super. Ct. No. 30-2021-01184633) |
| TODD SPITZER et al., | O P I N I O N |
| Defendants and Respondents. | |


Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge.  Reversed and remanded with directions.

O'Melveny & Myers, Michael G. Yoder, James G. Byrd, Jack V. Day, Abigail Formella; UCI Law Civil Rights Litigation Clinic, Paul Hoffman, Melanie Partow; UCI Law Criminal Justice Clinic, Eda Katharine Tinto; Schonbrun Seplow Harris Hoffman & Zeldes and John Washington for Plaintiffs and Appellants.

Alyssa Martinez, Amelia Piazza, Shubhra Shivpuri and Claire Simonich for Social Justice Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Sterne Kessler Goldstein & Fox, Christina E. Dashe, Richard A. Crudo, William H. Milliken and Junru Yu for Andrea Roth, Brandon L. Garrett and Yvette Garcia Missri as Amici Curiae on behalf of Plaintiffs and Appellants.

Summer Lacey, Peter Bibring, Tiffany M. Bailey; Nathan Freed Wessler, Patrick Toomey and Laura Moraff for American Civil Liberties Union Foundation of Southern California and American Civil Liberties Union Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Jennifer Lynch, Andrew Crocker and Saira Hussain for Electronic Frontier Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Leon J. Page, County Counsel, Laura D. Knapp, D. Kevin Dunn, Rebecca S. Leeds and Golnaz Zandieh, Deputy County Counsel, for Defendants and Respondents.

*          *          *

Plaintiffs William Thompson and Simon Cole (collectively, plaintiffs) are professors at the University of California, Irvine, and taxpaying residents of Orange County. They filed a taxpayer lawsuit under Code of Civil Procedure section 526a against Todd Spitzer, in his capacity as the Orange County District Attorney (OCDA), and the County of Orange (County; collectively, County defendants). Plaintiffs seek to enjoin County defendants from operating an allegedly unconstitutional DNA collection program (the OCDNA program) that authorizes County prosecutors to obtain DNA samples from persons charged with misdemeanors (alleged misdemeanants). Specifically, County prosecutors offer to drop or reduce charges or punishments in exchange for alleged misdemeanants' DNA, which the OCDA stores indefinitely in its own databank (the OCDNA database). Plaintiffs claim the OCDNA program violates alleged misdemeanants' rights to privacy, counsel, and due process and violates the unconstitutional conditions doctrine.

2

The trial court sustained County defendants' demurrer to plaintiffs' first amended complaint (FAC) without leave to amend. It characterized plaintiffs' claims as facial challenges to the OCDNA program. It also noted that alleged misdemeanants were required to sign waivers to participate in the program, in which they waived their rights to privacy and counsel. These waivers, the court concluded, barred any facial challenges to the OCDNA program. Plaintiffs appeal this ruling.

We agree the court erred by sustaining the demurrer as to the claims based on the right to privacy, the right to counsel, and due process. These claims assert both facial and as-applied challenges to the OCDNA program. Plaintiffs have sufficiently alleged the OCDNA program, as implemented by the OCDA, is unconstitutional. In particular, they have pled the waivers obtained from alleged misdemeanants to participate in the OCDNA program are not made knowingly or voluntarily.

In contrast, plaintiffs' unconstitutional conditions claim, as currently pled, only makes a facial challenge to the OCDNA program. Plaintiffs contend the entire practice of requiring a DNA sample as part of a plea bargain or negotiated dismissal is an unconstitutional condition regardless of how waivers are obtained from alleged misdemeanants. This is a facial challenge, not an as-applied claim. Plaintiffs have not sufficiently alleged that including a DNA provision as part of a plea deal or negotiated dismissal is facially unconstitutional.

Finally, the parties dispute whether plaintiffs have taxpayer standing to assert the above claims. Because plaintiffs have sufficiently alleged County defendants are operating the OCDNA program unlawfully, we find they have taxpayer standing.

For these reasons, we reverse the judgment entered following the court's demurrer ruling. On remand, the court shall enter a new order overruling the demurrer as to the claims for violations of the right to privacy, the right to counsel, and due process, and sustaining it as to the remaining claims.

# I

## FACTS AND PROCEDURAL HISTORY

### A. Statewide DNA Collection

"In 2004, California voters passed Proposition 69 (. . . known as the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (DNA Act)) to expand existing requirements for the collection of DNA identification information for law enforcement purposes." (*People v. Buza* (2018) 4 Cal.5th 658, 664 (*Buza*).) "For decades before the DNA Act, California law had required the collection of biological samples from individuals convicted of certain offenses. In 1983, the Legislature enacted legislation requiring certain sex offenders to provide blood and saliva samples before their release or discharge. [Citation.] In 1998, the Legislature enacted the DNA and Forensic Identification Data Base and Data Bank Act of 1998 [citation], which required the collection of DNA samples from persons *convicted* of certain felony offenses, including certain sex offenses, homicide offenses, kidnapping, and felony assault or battery." (*Id*. at p. 665, italics added.)

"When the California electorate voted to pass [the DNA Act] on the 2004 general election ballot . . . , it substantially expanded the scope of DNA sampling to include individuals who are *arrested* for any felony offense, as well as those who have been convicted of such an offense." (*Buza*, *supra*, 4 Cal.5th at p. 665, italics added; Pen. Code, § 296, subd. (a).)[1] Similarly, the DNA Act amended California law to mandate DNA collection from any person who commits a misdemeanor offense requiring registry as a sex offender or arsonist. (§ 296, subd. (a)(3); Initiative Measure (Prop. 69, § III.3, approved Nov. 2, 2004, eff. Nov. 3, 2004).) The DNA Act's requirement to collect DNA from persons arrested for serious crimes was generally found to be constitutional by our Supreme Court in *Buza* by a four-to-three vote. (*Buza*, at p. 665.)

---

[1] All further undesignated statutory references are to the Penal Code.

DNA samples collected under California law are stored in a statewide databank maintained by the Department of Justice. (§§ 295, subds. (g), (h), 295.1, subds. (c) & (d).) The Department of Justice is authorized to forward its DNA samples to the nationwide databank operated by United States Department of Justice under certain conditions. (§ 296.1, subd. (a)(6)(B).)

*B. The OCDNA Program*

The facts in this section are drawn from the allegations in the FAC, which we accept as true when evaluating the demurrer at issue. (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 806.)

In 2007, the County's Board of Supervisors approved Ordinance 07-003, which authorized the OCDA to establish its own local DNA collection program – the OCDNA program. Generally, the OCDNA program focuses on collecting DNA from alleged misdemeanants who are not required to provide a DNA sample under the statewide DNA collection program, *i.e.*, persons charged with misdemeanors not involving sexual offenses or arson (see § 296, subd. (a)(3)).[2] In contrast with the statewide program that mandates DNA collection for certain offenses, the OCDNA program obtains DNA samples through a purportedly voluntary exchange process. Specifically, OCDA prosecutors offer to drop charges or to reduce charges or punishments in exchange for the alleged misdemeanant's DNA sample.

Alleged misdemeanants who participate in the OCDNA program are required to sign a waiver form. The FAC cites a law review article – Andrea Roth, "*Spit and Acquit": Prosecutors As Surveillance Entrepreneurs* (2019) 107 Cal. L.Rev. 405, 457 (hereafter, Roth) – as the basis for plaintiffs' knowledge of the waiver form's

---

[2] Plaintiffs allege these deals are also offered to persons charged with low-level felonies, who are offered the chance to plead guilty to misdemeanor charges in exchange for their DNA. These persons are included within the defined term, "alleged misdemeanants."

contents. Roth's law review article includes a sample waiver (*ibid*), that plaintiffs assert the OCDA has provided to alleged misdemeanants.

The first paragraph of the waiver states that alleged misdemeanants "understand that the purpose of the [OCDNA] Program is to permit state and local law enforcement agencies to collect, permanently retain, search and use the DNA samples [the alleged misdemeanant is] providing to help solve crime accurately and expeditiously; enhance public safety; identify missing and unidentified persons; and deter, solve and prevent criminal conduct." (Roth, *supra*, 107 Cal. L.Rev. at p. 457.) The next few paragraphs notify alleged misdemeanants that (1) they will be providing their DNA sample to the OCDA "for permanent retention with the understanding that [their] OCDA DNA sample is a distinct and separate sample from the Department of Justice DNA samples . . . collected for the State Database and Data Bank Program pursuant to [the Penal Code]," and (2) their DNA sample "may be checked and/or searched against other DNA . . . in any local, state, national or international law enforcement database(s) for law enforcement purposes." (*Ibid*.)

The waiver also explains that by participating in the OCDNA program, alleged misdemeanants will be waiving their right to (1) have their DNA sample removed from the OCDNA database, (2) challenge the collection of their DNA sample in court, (3) challenge the collection and retention of their DNA sample for forensic identification, (4) a jury or court trial, (5) an attorney, where appropriate, and (6) their rights to participate in various drug diversion programs, where applicable. (Roth, *supra*, 107 Cal. L.Rev. at p. 457.)

According to the FAC, alleged misdemeanants are typically "pressured" into accepting these DNA deals without a full understanding of how their DNA will be used or their right to counsel. For example, plaintiffs assert that "[i]ndividuals charged in misdemeanor cases often arrive at their arraignment in court unfamiliar with criminal court procedures and practices. At the misdemeanor arraignment, many individuals are

called to speak with [a prosecutor] without understanding that they can speak with a public defender and ask questions about their rights and their case. Oftentimes, [prosecutors] will meet with alleged misdemeanants in the courthouse hallways to present the deal. . . . On information and belief, when a [prosecutor] offers to dismiss the case if the charged individual gives their DNA sample, many individuals feel pressured to accept this offer and agree to do so without a full understanding of their rights and their ability to speak to a public defender about the offer and their other options. Indeed, the offer is presented in such a way that unrepresented alleged misdemeanants often perceive it as an exploding offer that must be accepted at that time, or else the opportunity will be lost. When presented with this offer, alleged misdemeanants oftentimes are not informed about how their DNA will be used, how long it will be kept, or how it will be disseminated so that they can make an informed decision. On information and belief, individual [alleged misdemeanants] 'agree' to waive their rights and give up their DNA because they do not understand their right to counsel, they do not understand how or where their DNA will be disseminated, and they believe the offer will vanish if they wait to accept it."

Once alleged misdemeanants agree to participate in the OCDNA program, their DNA samples are collected at sites operated by the OCDA, which are located in five County courthouses. Once collected, the DNA samples are sent for analysis to an out-of-state lab operated by Bode Cellmark Forensics, Inc. (Bode). After analyzing each sample, Bode develops a DNA profile. It sends the resulting DNA profile to the OCDA, which is then uploaded into the OCDNA database. It is unclear what Bode does with the DNA samples after they are analyzed or whether Bode retains records of the DNA profiles after they are sent to the OCDA. Plaintiffs allege it is "unknown how long Bode keeps [alleged misdemeanants'] biological information, or if Bode stores or otherwise disseminates this information." Allegedly, "[t]he County's contract with Bode explains that there is no requirement that Bode destroy County residents' DNA information upon

7

the completion of testing.  Individuals who forfeit their DNA are unaware of whether and how Bode uses their personal DNA data . . . .”

The DNA profiles stored in the OCDNA database are indefinitely retained. Roughly 13,000 to 20,000 DNA samples are collected each year under the OCDNA program.  In 2018, there were about 182,000 DNA profiles in the OCDNA database. And as of April 2019, the OCDNA database was larger than the DNA databases of 25 states.  Despite the number of DNA profiles it has obtained, though, the OCDNA program has apparently been an ineffective tool for combatting or solving crime.  As of 2018, only 0.67 percent of the profiles within the OCDNA database had been matched to DNA collected from crime scenes, and the vast majority of these matches were to property or other nonviolent crimes.[3]

## C.  Plaintiffs’ Lawsuit

In February 2021, plaintiffs filed this taxpayer lawsuit under Code of Civil Procedure section 526a, challenging the constitutionality of the OCDNA program. County defendants filed a demurrer to the initial complaint, which was sustained with leave to amend.  Plaintiffs then filed the FAC.  Based on the above allegations, the FAC sought injunctive relief and set forth claims for (1) violation of the right to privacy under the state Constitution, (2) violation of the right to counsel under the federal and state Constitutions, (3) violation of the right to due process under the federal and state

---

[3]  Typically, a DNA sample is sent to a lab, which uses the sample to create a DNA profile.  (See *Buza*, *supra*, 4 Cal.5th at pp. 666-667.)  Various types of DNA profiles can be constructed from a DNA sample.  A profile can be made of a person’s entire genome. Narrower identification profiles can also be made using “‘noncoding’ DNA” that supposedly has “no known association with any genetic trait, disease, or predisposition.” (See *ibid.*; Roth, *supra*, 107 Cal. L.Rev. at pp. 413-414.)  It is unclear from the FAC what information can be gleaned from the DNA profiles in the OCDNA database.  But, as technology develops, DNA profiles supposedly limited to identification purposes may be used for other purposes.  (*Ibid.*)

8

Constitutions, (4) violation of the unconstitutional conditions doctrine, and (5) ultra vires violations (*i.e.*, acting outside the scope of statutory authority). County defendants filed a demurrer to the FAC, which the trial court sustained without leave to amend.

In its ruling, although plaintiffs claimed they were making facial and as-applied challenges to the OCDNA program, the court determined only a facial challenge had been made and analyzed plaintiffs' claims as such. It further expressed doubt that plaintiffs, who had not participated in the OCDNA program, had standing to bring as-applied challenges.

In evaluating plaintiffs' claims, the court found the waivers that alleged misdemeanants were required to sign to participate in the OCDNA program barred any facial challenge to the program based on violations of the rights to privacy and counsel. It determined plaintiffs had the burden of showing the waivers were invalid, and their allegations had not met that burden. Among other things, there was "no concrete allegation of any alleged misdemeanant who had failed to understand the ramifications of giving a sample." Further, with respect to DNA samples provided under plea bargains, the trial court noted that judges are obligated to ensure an alleged misdemeanant's waivers of rights are knowing and voluntary. (Citing *People v. Cross* (2015) 61 Cal.4th 164, 170.)

The demurrer to the due process claim was sustained because it was largely derivative of the privacy and right-to-counsel claims. While plaintiffs asserted an alternative theory that the OCDNA program violated due process because it lacked procedural safeguards, the court found this theory unsupported by authority.

Plaintiffs' remaining claims were also found to be deficient. As to the unconstitutional conditions claim, the court explained that the constitutionality of the DNA deals could not be resolved on a facial challenge. Rather, "whether a condition passes [constitutional] muster is a close, case-by-case evaluation specific to each criminal

defendant." Finally, the ultra vires claim failed because the court determined the OCDNA program was authorized by Government Code section 26500.5.

The court subsequently entered judgment in favor of County defendants. Plaintiffs appeal, challenging the demurrer rulings as to each cause of action except for the ultra vires claim. As explained below, we reverse the court's rulings as to the claims based on the rights to privacy, counsel, and due process, but we affirm the court's ruling as to the unconstitutional conditions claim.

II

DISCUSSION

### A. Review Standard

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.] Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment. The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "A demurrer must dispose of an entire cause of action to be sustained." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119.) Thus, a court must overrule a demurrer to a cause of action if it is based on at least one viable theory of liability.

"'In order to plead a cause of action, the complaint must contain a "statement of the facts constituting the cause of action, in ordinary and concise language." [Citation.] While it is true that pleading conclusions of law does not fulfill this requirement, it has long been recognized that "[t]he distinction between conclusions of law and ultimate facts is not at all clear and involves at most a matter of degree. [Citations.] For example, the courts have permitted allegations which obviously included conclusions of law and have termed them 'ultimate facts' or 'conclusions of fact.'"

10

[Citations.] *What is important is that the complaint as a whole contain sufficient facts to apprise the defendant of the basis upon which the plaintiff is seeking relief.*'" (*Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1098-1099.)

Likewise, "'[t]he particularity required in pleading facts depends on the extent to which the defendant in fairness needs detailed information that can be conveniently provided by the plaintiff; less particularity is required where the defendant may be assumed to have knowledge of the facts equal to that possessed by the plaintiff. [Citation.]' [Citation.] There is no need to require specificity in the pleadings because 'modern discovery procedures necessarily affect the amount of detail that should be required in a pleading.'" (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 608.)


## B.  Facial and As-applied Challenges

Plaintiffs contend their lawsuit challenges the OCDNA program both on its face and in its application, and the trial court erred by finding they had only made facial challenges.  We agree.

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.  [Citation.]  '"To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . .  Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions."'" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)

11

In contrast, "[a]n as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Tobe*, *supra*, 9 Cal.4th at p. 1084.)

Here, plaintiffs have made both facial and as-applied challenges to the OCDNA program. As to the former, plaintiffs believe the entire practice of exchanging DNA for dropped or reduced misdemeanor charges (other than certain sex or arson offenses) is unconstitutional. Put differently, the OCDNA program is unconstitutional even if plaintiffs are fully informed of the rights they will be waiving to participate in it and voluntarily agree to waive them. For instance, defendants' claim for unconstitutional conditions alleges, "[s]eizing alleged misdemeanants' DNA violates their rights, including their right to privacy." And it is unconstitutional to "require[e] misdemeanants to waive these rights . . . in exchange for the removal or reduction of charges."

Even if the OCDNA program is facially valid, though, plaintiffs allege it is being unconstitutionally implemented by the OCDA. For example, they claim alleged misdemeanants are routinely coerced into signing waivers without understanding their right to counsel and without being fully informed as to how their DNA will be used. These allegations do not attack the OCDNA program in its entirety. Rather, they seek relief from its unlawful applications, namely, the OCDA's purported practice of coercing alleged misdemeanants into involuntarily signing waivers they do not fully understand. An as-applied challenge is the correct vehicle to attack the OCDA's implementation of

12

the OCDNA program and to enjoin future unlawful applications of it. (*Tobe*, *supra*, 9 Cal.4th at p. 1084.)

## C. Taxpayer Standing

Though plaintiffs have not participated in the OCDNA program, they were taxpaying residents of the County during the relevant period. It is uncontested that they have taxpayer standing to facially challenge the OCDNA program, but County defendants appear to contend that plaintiffs cannot rely on taxpayer standing for their as-applied challenges. We disagree.

Taxpayer standing derives from Code of Civil Procedure section 526a, subdivision (a). It provides, "[a]n action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency . . . ." (Code Civ. Proc., § 526a, subd. (a).)

Code of Civil Procedure "[s]ection 526a provides a mechanism for controlling illegal, injurious, or wasteful actions by [government] officials. That mechanism, moreover, remains available even where the injury is insufficient to satisfy general standing requirements under [Code of Civil Procedure] section 367." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1249.) As our Supreme Court has explained, the purpose of taxpayer standing is to enable """a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement."' [Citation.] In light of this purpose, it is crucial that the statute provide a '"broad basis of relief."' [Citation.] Accordingly, [courts have] construed section 526a liberally . . . in light of its remedial purpose." (*Id.* at

13

p. 1251.) "Cases that challenge the legality or constitutionality of governmental actions fall squarely within the purview of section 526a." (*California DUI Lawyers Assn. v. Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1261 (*California DUI Lawyers*).)

County defendants appear to contend that only an individual that has been harmed by the OCDNA program can make an as-applied challenge. To the extent they are wrong on this point, they also argue plaintiffs must at least identify someone harmed by the program. Because the FAC has not done so, they maintain plaintiffs have not sufficiently alleged they have taxpayer standing to bring an as-applied challenge. These arguments are unpersuasive.

As to the first argument, taxpayer standing may be used to challenge ordinances that are unconstitutional on their face or in their application. (*Tobe*, *supra*, 9 Cal.4th at p. 1086; see, e.g., *California DUI Lawyers*, *supra*, 20 Cal.App.5th at pp. 1262-1263 [plaintiffs had taxpayer standing to bring facial and as-applied challenges to an administrative hearing system].) Parties can use taxpayer standing to challenge a program that has not directly harmed them. (*White v. Davis* (1975) 13 Cal.3d 757, 764–765.) Indeed, such a party can maintain taxpayer standing even if there are other potential plaintiffs that have suffered direct harm from the program that could file suit. (*California DUI Lawyers*, at p. 1263.) Thus, for purposes of taxpayer standing, it does not matter that plaintiffs have not participated in the OCDNA program. Likewise, plaintiffs can still rely on taxpayer standing even though there are OCDNA program participants that could potentially bring suit.

As to the second argument, nothing in the text of the statute requires a plaintiff to identify a person harmed by the program to maintain taxpayer standing, nor are we aware of any case law to this effect. We refuse to adopt such a requirement, as it would interfere with the goals of taxpayer standing. To illustrate, we modify an example given by the American Civil Liberties Union in its amicus brief. Assume a group of

14

taxpayers claimed their local sheriff's department was operating a surveillance program. The taxpayers did not assert the surveillance program itself was unconstitutional. Rather, they claimed the program, as applied, unconstitutionally targeted certain ethnic groups. Given the secretive nature of surveillance programs, it would likely be difficult to identify any person that had been harmed by the program. Nearly all the people unconstitutionally targeted by the program would be unaware they had been surveilled.

Within this hypothetical, it would be unreasonable to preclude taxpayers from challenging this surveillance program until they could identify a person harmed by it. Doing so would also conflict with the broad remedial purpose of Code of Civil Procedure section 526a, which is intended to promote "prompt action to '"prevent irremediable public injury."'" (*Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 749; see *Davis v. Fresno Unified School Dist.* (2020) 57 Cal.App.5th 911, 930 [taxpayer standing is construed broadly to promote its remedial purpose].) Moreover, where taxpayers are asserting an agency is generally applying a program unconstitutionally, such as here, identifying a specific person or persons harmed by the program would serve little practical purpose. The agency has already been made aware of the alleged unconstitutionality of the program. Identifying a specific person harmed by the program would not meaningfully contribute to the agency's understanding of the lawsuit.

To clarify, we do not hold that taxpayer standing can always be used to make as-applied challenges to government programs. For example, using the hypothetical above, assume the taxpayers did not assert that the surveillance program unconstitutionally targeted certain ethnic groups. Rather, they asserted the program had unlawfully surveilled a single person without a warrant. Our ruling today would not automatically grant standing to such taxpayers. Taxpayer standing may not be applicable in cases involving abnormal applications of a program to a discrete person or a small group of people. We need not decide this issue since it is immaterial here. Plaintiffs' as-

15

applied claims are not based on an aberrant application of the OCDNA program. Rather, they claim the OCDNA program is generally being unlawfully implemented by the OCDA. Taxpayer standing is appropriate for such a challenge.

However, "[a] taxpayer action does not lie where the challenged governmental conduct is legal." (*Lyons v. Santa Barbara County Sheriff's Office* (2014) 231 Cal.App.4th 1499, 1503.) As such, plaintiffs only have taxpayer standing if they have sufficiently alleged constitutional violations in the FAC. If their allegations are insufficient to show constitutional violations have occurred, then plaintiffs do not have taxpayer standing. Since we find below that plaintiffs have adequately alleged as-applied constitutional violations, they have taxpayer standing to pursue these claims.

*D. The Waiver*

The focal point of the trial court's ruling was the waiver that alleged misdemeanants are required to sign to participate in the OCDNA program. The court found the waiver barred any facial challenges to the OCDNA program based on the right to privacy and the right to counsel. Because plaintiffs' due process claim was primarily based on violations of these aforementioned rights, the court held it also failed. We find plaintiffs have adequately alleged the waivers are invalid due to the manner in which they are obtained. Plaintiffs have sufficiently pled the OCDNA program, as applied by the OCDA, violates alleged misdemeanants' rights to privacy, counsel, and due process.

"'Waiver is the intentional relinquishment of a known right after knowledge of the facts.'" (*Lanigan v. City of Los Angeles* (2011) 199 Cal.App.4th 1020, 1030.) "'Waiver requires a voluntary act, knowingly done, with sufficient awareness of the relevant circumstances and likely consequences. [Citation.] There must be actual or constructive knowledge of the existence of the right to which the person is entitled.'" (*Kelly v. William Morrow & Co.* (1986) 186 Cal.App.3d 1625, 1635.) "A waiver of a constitutional right is 'not to be implied and is not lightly to be found.'" (*Petrillo v. Bay*

16

*Area Rapid Transit Dist.* (1988) 197 Cal.App.3d 798, 810.)  Likewise, "waiver of constitutional rights is not presumed [citations]; on the contrary, "'courts indulge every reasonable presumption against waiver" of fundamental constitutional rights.'"  (*Isbell v. County of Sonoma* (1978) 21 Cal.3d 61, 68-69.)

Generally, the party claiming waiver has the burden of proving it by clear and convincing evidence and """"doubtful cases will be decided against a waiver."""" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)  Here, the trial court found plaintiffs had the burden of showing the waivers were invalid because they had "made the illegality of the waivers an element of their claims."  It clarified, plaintiffs' "theory of liability is 'the County illegally takes defendants' DNA *because the waiver is illegal.*'" On appeal, the parties dispute which side has the burden on the waiver issue.  We need not decide.  Even if plaintiffs have the burden, they have alleged sufficient facts showing the waivers are invalid.

### 1.  Right to privacy

Among other things, plaintiffs claim the waiver of privacy rights obtained by the OCDA is invalid because alleged misdemeanants are not fully informed as to how their DNA will be maintained and used.  We agree.

California's Constitution contains an express right to privacy.  (Cal. Const., art. I, § 1.)  One of its principal aims "is to limit the infringement upon personal privacy arising from the government's increasing collection and retention of data relating to all facets of an individual's life."  (*White v. Davis*, *supra*, 13 Cal.3d at p. 761.)  In particular, the constitutional right to privacy was intended to protect individuals from "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society."  (*Id*. at pp. 773-774.)

"Courts have . . . recognized that DNA contains an extensive amount of sensitive personal information beyond mere identifying information, and people therefore

17

have a strong privacy interest in controlling the use of their DNA." (*County of San Diego v. Mason* (2012) 209 Cal.App.4th 376, 381 (*Mason*).) These privacy "interests implicate . . . the privacy rights enjoyed by all Californians under the explicit protection of article I, section 1 of the California Constitution." (*Buza*, *supra*, 4 Cal.5th at pp. 689-690.) While these privacy rights may be waived, "waivers of constitutional rights are not lightly found." (*Heda v. Superior Court* (1990) 225 Cal.App.3d 525, 530.)

To participate in the OCDNA program, alleged misdemeanants are required to waive certain rights pertaining to their DNA, including the right to challenge its collection. (Roth, *supra*, 107 Cal. L.Rev. at p. 457.) According to the FAC, though, alleged misdemeanants are not fully informed as to the parties that will possess their DNA information or the potential purposes for which their DNA could be used. The waiver only states alleged misdemeanants are providing DNA samples to the OCDA to combat criminal activity and to identify missing and unidentified persons. (*Ibid*.) Nothing in the waiver notifies alleged misdemeanants that their DNA samples will be sent to a third party, Bode, for analysis. (*Ibid*.) Further, alleged misdemeanants are not told by prosecutors how Bode will store their DNA information, how long Bode will retain their DNA information, for what purposes Bode can use their DNA information, or whether any other third party may possess or have access to their DNA. Nor is this information publicly available. Plaintiffs also allege "[t]he County's contract with Bode explains that there is no requirement that Bode destroy [alleged misdemeanants'] DNA information upon the completion of testing."

When evaluating a waiver of DNA rights, we must consider that a DNA sample contains a trove of personal information. As Justice Cuéllar explained in his dissent in *Buza*, "DNA samples contain a wealth of genetic information, which would make an individual nervous about possible violations of his or her privacy as long as the information remains in the state's possession." (*Buza*, *supra*, 4 Cal.5th at p. 719 (dis. opn. of Cuéllar, J.).) "That one's DNA reveals much of a person's most private, closely

18

guarded information is difficult to dispute." (*Id*. at p. 720.) A DNA sample can reveal "an arrestee's entire genetic code—information that has the capacity to reveal the individual's race, biological sex, ethnic background, familial relationships, behavioral characteristics, health status, genetic diseases, predisposition to certain traits, and even the propensity to engage in violent or criminal behavior." (*Ibid*.) A "DNA profile . . . thus has the potential to reveal vast amounts of personal information about those individuals, and to be used in ways starkly different relative to what justified the scheme. [Citation.] One can scarcely imagine personal information that falls more closely to the core of the 'realm of guaranteed privacy'. . . ." (*Ibid*.)

Due to its complexity, a significant number of alleged misdemeanants will likely be unaware of the information their DNA may reveal and how that information may be exploited. And, as technology advances, DNA samples and profiles will reveal far more extensive information than we currently know. (*U.S. v. Kriesel* (9th Cir. 2007) 508 F.3d 941, 947-948; *U.S. v. Kincade* (9th Cir. 2004) 379 F.3d 813, 842, fn. 3 (conc. opn. of Gould, J.).) These far-ranging privacy implications associated with DNA differentiate a DNA waiver from other constitutional rights criminal defendants typically waive when entering plea deals, such as the right to a jury trial, the right to counsel, or the right to confront witnesses. When criminal defendants agree to waive any of these trial or trial-related rights, it is reasonably clear what they are surrendering. DNA waivers are not so straightforward. A vaguely worded DNA waiver can potentially conceal from alleged misdemeanants the persons having access to their DNA and/or the different purposes for which their DNA might be used. Because alleged misdemeanants will typically be unaware of all the ways their DNA may be exploited for information, now and in the future, it is imperative that a DNA waiver sufficiently apprises them of the rights they will be giving up.

For a DNA waiver to be knowing and voluntary, alleged misdemeanants must be reasonably informed as to how their DNA sample, as well as the resulting DNA

19

profile, will be stored and used. At a minimum, they must be notified of (1) whether a third party will have possession of their DNA sample or DNA information, (2) how long any third party will retain possession of their DNA sample or any other DNA information, and (3) whether there are any limits (or lack of limits) as to how the OCDA or third parties may use or distribute their DNA sample or DNA information. As to the third point, this includes disclosures as to whether an alleged misdemeanant's DNA can be used by the OCDA or a third party to investigate whether a relative of an alleged misdemeanant is potentially a suspect in a crime. (See Henry T. Greely et al., *Family Ties: The Use of DNA Offender Databases to Catch Offenders' Kin* (2006) 34 Medicine & Ethics L.J. 248, 250-254.) If the OCDA is unaware of how long a third party will retain any DNA information or of any limits on the third party's use or distribution of that information, it must tell alleged misdemeanants it does not know.

Alleged misdemeanants must be given a reasonable amount of information regarding their DNA waiver so they have a baseline understanding as to how their DNA will be maintained and used. At the same time, however, it is impractical to require the OCDA to explain the many ways DNA can be exploited, especially considering the rapid acceleration of DNA technology. The above disclosures attempt to strike an appropriate balance between these interests. Without the above information, alleged misdemeanants cannot make an informed waiver because they lack sufficient understanding of the relevant circumstances and likely consequences that may result from participating in the OCDNA program. Specifically, they are unaware whether (1) third parties may possess their DNA, (2) their DNA may be used for purposes unrelated to criminal investigation, and/or (3) their DNA may be used to perform criminal investigations into their relatives. While the above disclosures are far from comprehensive, they provide enough information to alert alleged misdemeanants of these possibilities.

Based on the allegations in the FAC, alleged misdemeanants are not being given sufficient information to execute valid waivers to participate in the OCDNA

20

program. While the waiver informs them that their DNA will be used for crime-solving and identification purposes, it does not expressly limit the use of their DNA to such purposes. Nor does it inform alleged misdemeanants that a third party will possess their DNA, how long that third party will maintain possession, or of any limits on how the third party may use their DNA. Nor does it inform alleged misdemeanants whether their DNA can be used to criminally investigate their relatives. As such, we cannot conclude at this point in the proceedings that alleged misdemeanants are providing valid waivers of their right to privacy in their DNA.

There is also some dispute as to whether plaintiffs have sufficiently alleged that County defendants are violating alleged misdemeanants' right to privacy. They have. To state such a claim, plaintiffs "must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-40.) "Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." (*Id*. at p. 40.)

As to the first element, alleged misdemeanants have a privacy interest in their DNA and genetic information. (*Buza*, *supra*, 4 Cal.5th at pp. 689-690; *Mason*, *supra*, 209 Cal.App.4th at p. 381.) The second and third elements are also met. Alleged misdemeanants have a reasonable expectation that their DNA sample will not be provided to third parties. As set forth above, the waiver does not inform alleged misdemeanants that their DNA sample will be sent to a third party for analysis. Nor are alleged misdemeanants told how long the third party will retain their DNA information or

21

the uses for which the third party can use such information. As to the third element, the fact that alleged misdemeanants' DNA can be held indefinitely by a third party for unknown uses without their informed consent is sufficient to allege an invasion of privacy. (See *ibid*.) At this stage, plaintiffs do not have to allege the third party used their DNA for any particular purpose to establish a violation of their right to privacy.

### 2. Right to counsel

"[T]he right to counsel attaches . . . when judicial proceedings have commenced." (*People v. Cook* (2007) 40 Cal.4th 1334, 1352.) "[T]he typical California criminal prosecution commences . . . no later than the point at which the prosecutor files a criminal complaint." (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1194-1195.) Under the United States Constitution, the right to counsel is limited to misdemeanor cases that lead to imprisonment. (*Scott v. Illinois* (1979) 440 U.S. 367, 373-374; *People v. Disandro* (2010) 186 Cal.App.4th 593, 600.) Under the California Constitution, though, the right to counsel applies to all persons charged with misdemeanors. (*Rodriguez v. Municipal Court* (1972) 25 Cal.App.3d 521, 527.)

Under both the federal and state Constitutions, a defendant is entitled to counsel during pleading and plea bargaining. "The pleading—and plea bargaining— stage of a criminal proceeding is a critical stage in the criminal process at which a defendant is entitled to the effective assistance of counsel guaranteed by the federal and California Constitutions." (*In re Alvernaz* (1992) 2 Cal.4th 924, 933; *Lafler v. Cooper* (2012) 566 U.S. 156, 162.) County defendants acknowledge an alleged misdemeanant that is unrepresented must waive their right to counsel before a prosecutor can speak with them at arraignment. (Citing § 987, subd. (a); Rules Prof. Conduct, rule 3.8(b) & (c).) We accept this concession as true for purposes of this appeal.

In the FAC, plaintiffs contend most alleged misdemeanants are unfamiliar with criminal court procedures. At their arraignment, they are called to speak with

prosecutors without understanding that they can consult with a public defender. "[W]hen a [prosecutor] offers to dismiss the case if the charged individual gives up their DNA sample, many individuals feel pressured to accept this offer and agree to do so without a full understanding of their rights and their ability to speak to a public defender about the offer and their other options. . . . On information and belief, [alleged misdemeanants] 'agree' to waive their rights and give up their DNA because they do not understand their right to counsel, they do not understand how or where their DNA will be disseminated, and they believe the offer will vanish if they wait to accept it."

The FAC is vague as to when prosecutors are approaching alleged misdemeanants. But, in their appellate briefs, plaintiffs clarify that (1) these deals are allegedly offered to plaintiffs prior to the arraignment hearing, where the court would have advised alleged misdemeanants of their right to counsel (§ 987, subd. (a)), and (2) prosecutors are allegedly speaking with unrepresented alleged misdemeanants and negotiating DNA deals with them before they have affirmatively waived their right to counsel in violation of the Rules of Professional Conduct, rule 3.8(b) and (c).

"It is now settled that the guarantee of counsel [in the California Constitution] extends to misdemeanor cases . . . that the defendant must be made fully aware of his right to counsel; that the court must not only advise him of it, but must also inform him that the court will provide an attorney if he cannot afford one; that these are constitutional demands. [Citation.] In order to establish a waiver of counsel, the record must show that the defendant was informed of his right to counsel or that he knew of his right and intelligently and knowingly waived it." (*In re Render* (1969) 271 Cal.App.2d 423, 425.) Accepting the FAC's allegations as true, prosecutors are approaching alleged misdemeanants prior to being advised by the court of their right to counsel, prior to waiving their right to counsel, and before they fully understand their right to counsel. Given these allegations, we cannot find alleged misdemeanants' waivers of counsel are being made voluntarily or with sufficient knowledge. (See *ibid*; Rules Prof. Conduct,

23

rule 3.8(b) & (c); *People v. Cummings* (1967) 255 Cal.App.2d 341, 345-346 [a waiver of counsel is not lightly found, and courts will indulge every reasonable presumption against waiver].) Indeed, as set forth above, County defendants admit such conduct, if true, would be improper. County defendants contend that we must presume alleged misdemeanants waived their right to counsel before being approached by prosecutors. They rely on Evidence Code section 664, which states, "[i]t is presumed that official duty has been regularly performed." To the extent this statutory presumption applies, though, plaintiffs can plead facts to overcome it. (*Romero v. County of Santa Clara* (1970) 3 Cal.App.3d 700, 703.) The above allegations are enough to overcome this presumption.

Finally, the trial court found the waivers were presumptively valid because "[w]hen a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary." (*People v. Cross* (2015) 61 Cal.4th 164, 170.) Similarly, "in California, the prosecutor may not unilaterally abandon a prosecution [citation]; only the court may dismiss a criminal charge." (*Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1055.) Regardless of these judicial checks, plaintiffs have alleged these violations are occurring. We must accept their allegations as true for purposes of this demurrer. (*Fox v. JAMDAT Mobile, Inc.* (2010) 185 Cal.App.4th 1068, 1078.)

### 3. Due process

Under the United States Constitution, "the strictures of due process apply only to the threatened deprivation of liberty and property interests deserving the protection of the federal and state Constitutions." (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1059.) Under the state Constitution, plaintiffs must "identify a statutorily conferred benefit or interest of which he or she has been deprived to trigger procedural due process." (*Id*. at p. 1071.)

Here, among other things, plaintiffs claim alleged misdemeanants were denied their constitutional right to a fair trial based on the above violations to their privacy rights and their right to counsel. Since the trial court found these latter rights had not been violated, it concluded plaintiffs had not shown that alleged misdemeanants were deprived of any protected interest. So, it sustained County defendants' demurrer to the due process claim. Since we have reversed the trial court as to the privacy and right to counsel claims, we find plaintiffs' due process claim sufficiently alleges a deprivation of a protected interest.

County defendants also appear to argue that plaintiffs cannot assert taxpayer standing based on due process violations to others, but this is inaccurate. (See, e.g., *California DUI Lawyers*, *supra*, 20 Cal.App.5th at pp. 1251, 1258-1263 [attorney association had taxpayer standing to allege due process violations committed by the Department of Motor Vehicles].)

### E. Unconstitutional Conditions Doctrine

"'[T]he government may not deny a benefit to a person because he exercises a constitutional right.'" (*Koontz v. St. Johns River Water Mgmt. Dist.* (2013) 570 U.S. 595, 604.) "The doctrine of unconstitutional conditions limits the government's power to require one to surrender a constitutional right in exchange for a discretionary benefit. [Citation.] When receipt of a public benefit is conditioned upon the waiver of a constitutional right, the '"government bears a heavy burden of demonstrating the practical necessity for the limitation."' [Citation.] '[H]owever well-informed and voluntary that waiver, the governmental entity seeking to impose those conditions must establish: (1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there are available no alternative means less subversive

25

of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit.'" (*San Diego County Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1158-1159.)

Unlike the three claims above, plaintiffs' claim for violation of the unconstitutional conditions doctrine is solely a facial challenge to the entire OCDNA program. Their claim is based on allegations that "[s]eizing alleged misdemeanants' DNA violates their rights, including their right to privacy. By requiring misdemeanants to waive these rights . . . in exchange for removal or reduction of charges, Defendants impose an unconstitutional condition." Rather than challenging the OCDA's implementation of the OCDNA program, this claim challenges the validity of the whole scheme. We find the unconstitutional conditions claim, as pled, fails to state a cause of action.

"The plea bargaining process necessarily exerts pressure on defendants to plead guilty and to abandon a series of fundamental rights, but we have repeatedly held that the government 'may encourage a guilty plea by offering substantial benefits in return for the plea.' [Citation.] 'While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable"—and permissible—"attribute of any legitimate system which tolerates and encourages the negotiation of pleas."'" (*U.S. v. Mezzanatto* (1995) 513 U.S. 196, 209-210.) In California, conditions in plea agreements "that impinge on constitutional rights . . . are valid as long as 'they are narrowly drawn to serve the important interests of public safety and rehabilitation [citation] and if they are specifically tailored to the individual.'" (*Alhusainy v. Superior Court* (2006) 143 Cal.App.4th 385, 390-391.) These same considerations are relevant when considering negotiated dismissals. (See *Hoines v. Barney's Club, Inc.* (1980) 28 Cal.3d 603, 612.)

Based on the FAC's allegations, we cannot find the OCDNA program facially violates the unconstitutional conditions doctrine. Under plaintiffs' theory, taking a DNA sample from an alleged misdemeanant will never outweigh the resulting impairment of constitutional rights. But, as mentioned above, the constitutional rights to privacy and counsel can generally be waived so long as the waivers are knowing and voluntary. Further, their argument overlooks the vast differences in offenses that can be charged as misdemeanors. For example, driving without a license or failure to appear in court for a traffic violation may be charged as misdemeanors. (*People v. Spence* (2005) 125 Cal.App.4th 710, 718; *People v. Foster* (2001) 89 Cal.App.4th Supp. 1, 2.) However, assault with a firearm is a so-called "wobbler" offense that can be charged as a felony or misdemeanor. (§ 245, subd. (a)(2); *In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1495, fn. 4.) Similarly, assault with a deadly weapon and spousal battery may also be charged as felonies or misdemeanors. (§§ 245, subd. (a)(1), 273.5, subd. (a)(1).)

Our Supreme Court has held that DNA can be collected from defendants that are "validly arrested on 'probable cause to hold for a serious offense.'" (*People v. Buza, supra*, 4 Cal.5th at p. 665.) Given the seriousness and potential violence associated with certain misdemeanor offenses, requiring a DNA sample as a part of a plea deal or a negotiated settlement may be sufficiently tailored to protect public safety in certain cases. (See *Alhusainy v. Superior Court, supra*, 143 Cal.App.4th at pp. 390-391.) Thus, based on the current allegations, we cannot say the OCDNA program ""inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions."" (*Tobe, supra*, 9 Cal.4th at p. 1084.)

Plaintiffs have not made any argument as to how they might amend this claim. However, we recognize that given the substance of County defendants' demurrer and the thrust of the trial court's tentative ruling, they may not have had a meaningful opportunity to do so. As such, we direct the court on remand to consider arguments from plaintiffs as to whether they should be given leave to amend this claim.

27

### III

### DISPOSITION

The judgment is reversed.  On remand, we direct the trial court to enter an order overruling the demurrer as to the claims for violations of the right to privacy, the right to counsel, and due process, and sustaining it as to the unconstitutional conditions and ultra vires claims.  Plaintiffs shall be given an opportunity to provide argument as to whether they can amend their unconstitutional conditions claim, but they are denied leave to amend as to their ultra vires claim since they abandoned this claim on appeal.

Our ruling does not directly address the facial challenges plaintiffs have made based on violations of the rights to privacy, counsel, and due process.  We only find plaintiffs have sufficiently alleged as-applied violations as to these rights; thus, these claims survive demurrer.  (*Fremont Indemnity Co. v. Fremont General Corp.*, *supra*, 148 Cal.App.4th at p. 119 [a demurrer must dispose of an entire cause of action].)  Our ruling does not preclude County defendants from moving to strike these facial challenges.  (See *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682-1683.)  Nor does it preclude plaintiffs from moving to amend the FAC to add allegations to support the facial challenges based on the rights to privacy, counsel, and/or due process.

Plaintiffs are entitled to their costs on appeal.[4]

 

 MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

MOTOIKE, J.

---

[4] The request for judicial notice filed by County defendants is denied. The portion of the Orange County Codified Ordinances is immaterial to our analysis. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].) The waiver form for which they seek judicial notice is substantially identical to the waiver contained in Roth, *supra*, 107 Cal. L.Rev. at page 457, which we described above. (See *ibid*.)